[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 16, 2003
THOMAS K. KAHN
CLERK

—————

No. 02-11799

—————

D. C. Docket No. 00-00577 CV-C-S

ELISABETH GLAZNER,

Plaintiff-Appellant,

versus

JAMES GLAZNER,

Defendant-Appellee.

—————

Appeal from the United States District Court
for the Northern District of Alabama

—————

**(October 16, 2003)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON,
Circuit Judges.

DUBINA, Circuit Judge:

We took this case en banc to decide the continued validity of *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974),[1] a decision of our predecessor circuit finding an implied exception in Title III of the Omnibus Crime Control and Safe Streets Acts of 1968 ("Title III") for interspousal wiretapping within the marital home. For the reasons that follow, we overrule the *Simpson* decision. We also conclude that the rule we announce today applies retroactively.

## I. BACKGROUND

The facts and procedural history of this case are taken largely from the panel decision. *See Glazner v. Glazner*, 330 F.3d 1298 (11th Cir. 2002), *vacated*, 321 F.3d 1336 (11th Cir. 2003).[2]

After being married 19 years, James Glazner ("James") filed for divorce against his wife, Elisabeth Glazner ("Elisabeth"). During the divorce proceedings, James put a recording device on a telephone in the marital home. The device recorded a number of conversations between Elisabeth and third parties without

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

[2] The panel opinion was published in a later volume of the Federal Reporter because the original panel opinion, published at 316 F.3d 1185, was erroneously withdrawn and republished at 330 F.3d 1298.

2

the consent of any party to the conversations. Elisabeth discovered the device and filed a complaint in the United States District Court for the Northern District of Alabama against James seeking damages as a result of an alleged violation of Title III, and damages for a number of state law claims.

Elisabeth based her federal claim on the wiretapping provisions of Title III, 18 U.S.C. §§ 2510-22. Parts of that law prohibit non-consensual recordings of private conversations, subject to certain specified exceptions, and authorize civil remedies on behalf of those who suffer violations of the statutory provisions. During the course of the litigation, James filed a motion for summary judgment. Notwithstanding a finding by the district court that James wiretapped Elisabeth's conversations with third parties, the district court granted James's motion for summary judgment based on *Simpson,* which read an interspousal exemption into the provisions of Title III. The district court dismissed Elisabeth's state law claims without prejudice under 28 U.S.C. § 1367(c).

Elisabeth filed a timely notice of appeal of the district court's judgment. Even though the panel opinion was critical of the *Simpson* decision and concluded that it should be overruled, the panel recognized that under the prior panel precedent rule, the panel was bound to follow the *Simpson* decision unless and until it was overruled by this court sitting en banc or by the Supreme Court. *See*

3

*Saxton v. ACF Indus., Inc.*, 254 F.3d 959, 960 n.1 (11th Cir. 2001) (en banc); *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001); *United States v. Steele*, 147 F.3d 1316, 1317-18 (11th Cir. 1998) (en banc). Based on *Simpson,* the panel decision affirmed the district court's grant of summary judgment in favor of James. We subsequently entered an order granting Elisabeth's petition for rehearing and vacating the panel opinion. *See Glazner*, 321 F.3d at 1336.

## II. ISSUES

The en banc court directed counsel to brief the following issues:

(1) Should the rule announced in *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974), be overturned?

(2) If so, should the new rule be applied in this case?

## III. DISCUSSION

A. *Simpson v. Simpson*

Title III broadly prohibits the interception of wire communications. *See* 18 U.S.C. § 2511. To determine whether or not James's actions constitute a violation of Title III, we must first look to the language of the statute itself. *United States v. Kirkland*, 12 F.3d 199, 202 (11th Cir. 1994) (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 2527, 69 L. Ed. 2d 246 (1981)). Title III states:

4

(1) Except as otherwise specifically provided in this chapter *any* person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, *any* wire, oral, or electronic communication . . . shall be punished . . . or shall be subject to suit . . . .

18 U.S.C. § 2511 (emphasis added). Neither party disputes that none of the statutory exceptions to which subsection (1) refers applies in this case. *See also Simpson*, 490 F.2d at 804-05 (recognizing that none of the statutorily stated exceptions applied to circumstances factually identical to the present case). The statute expressly gives "*any* person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" the right to bring a civil action against "the person or entity . . . which engaged in that violation." 18 U.S.C. § 2520(a) (emphasis added).

In the present case, Elisabeth is "any person" within the meaning of § 2520(a). James is "any person" within the meaning of § 2511(1)(a). Finally, Elisabeth's conversations that James caused to be intercepted and recorded are any "wire, oral, or electronic communication" within the meaning of § 2520(a).

The language of Title III is clear and unambiguous. It makes no distinction between married and unmarried persons or between spouses and strangers. It plainly applies to "any person" on both sides of the violation (save only the inapplicable exceptions).

5

The one circumstance in which a court may properly look beyond the plain language of a statute is where giving effect to the language used by Congress would lead to a truly absurd result. *United States v. Maung*, 267 F.3d 1113, 1121 (11th Cir. 2001); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1188 (11th Cir. 1997). Neither the court in *Simpson* nor any of the parties in this case suggest that the absurdity exception applies to prevent Title III's provisions from governing interspousal behavior. The language of Title III demonstrates that Congress decided that one spouse should not be permitted to record, without consent, electronically transmitted conversations between the other spouse and third parties. This prohibition is not truly absurd.

Equally compelling is the fact that, since the Fifth Circuit decided *Simpson* nearly three decades ago, an overwhelming majority of the federal circuit and district courts, as well as state courts, addressing the issue have refused to imply an exception to Title III liability for interspousal wiretapping. *See Heggy v. Heggy*, 944 F.2d 1537, 1539 (10th Cir. 1991) (concluding that Title III applies to interspousal wiretapping); *Kempf v. Kempf*, 868 F.2d 970, 972-73 (8th Cir. 1989) (same); *Pritchard v. Pritchard*, 732 F.2d 372, 374 (4th Cir. 1984) (same); *United States v. Jones*, 542 F.2d 661, 667 (6th Cir. 1976) (same); *Gill v. Willer*, 482 F. Supp. 776, 778 (W.D.N.Y. 1980) (finding the reasoning in *Simpson* to be

6

unpersuasive); *Kratz v. Kratz*, 477 F. Supp. 463, 473-75 (E.D. Pa. 1979) (rejecting *Simpson* as contradictory to the explicit language of the statute and clear intent of Congress)*; Remington v. Remington*, 393 F. Supp. 898, 901 (E.D. Pa. 1975) (finding that a husband had asserted a valid civil cause of action against his wife for the installation of a wiretapping device)*; Ex parte O'Daniel*, 515 So. 2d 1250, 1253 (Ala. 1987) (same); *People v. Otto*, 831 P.2d 1178, 1185 (Cal. 1992) (same); *Rickenbaker v. Rickenbaker*, 226 S.E.2d 347, 352 (N.C. 1976) (same); *Pulawski v. Blais*, 506 A.2d 76, 77 n.2 (R.I. 1986) (same); *W. Va. Dep't of Health & Human Res. ex rel. Wright v. David L.*, 453 S.E.2d 646, 652 (W. Va. 1994) (same). *But see Anonymous v. Anonymous*, 558 F.2d 677, 679 (2d Cir. 1977) (holding that the facts of that case involving interspousal wiretapping did not constitute a violation of Title III, but noting that the court did not suggest "that a plaintiff could never recover damages from his or her spouse under the Federal wiretap statute"); *Stewart v. Stewart*, 645 So. 2d 1319, 1321 (Miss. 1994) (concluding that Title III does not apply to domestic relations cases); *Baumrind v. Ewing*, 279 S.E.2d 359, 360 (S.C. 1981) (same).

We are persuaded by the reasoning of all the courts which have refused to find an exception for interspousal wiretapping either explicitly in the text of Title

III or implicitly in the legislative history.[3] While we agree with the dissent that the concept of the rule of law underlying our Constitution requires a substantial measure of continuity, certainty, and respect for precedent, we must follow the Supreme Court's instruction that *stare decisis* should be abandoned where, as here, "a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 854, 112 S. Ct. 2791, 2808, 120 L. Ed. 2d 674 (1992); *see also Lawrence v. Texas*, – U.S. – ,123 S. Ct. 2472, 2483-84, – L. Ed. 2d – (2003) (recognizing the essential role of *stare decisis* but nonetheless overruling *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986)). Therefore, we hold that no exception for interspousal wiretapping exists in Title III. Accordingly, we overrule *Simpson.*

B. <u>Prospective or Retroactive Application</u>

We now turn to the question of whether we should apply the rule that we announce today retroactively or prospectively. "Generally, new rules of law are applied retroactively as well as prospectively." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 544 (11th Cir. 2002) (en banc). However, in 1971, the

---

[3] If Congress had disagreed with this interpretation, it has had many opportunities to add an explicit exception for interspousal wiretapping in the act. For whatever reason, Congress has chosen not to do so.

Supreme Court allowed for prospective-only application of newly announced rules in civil cases. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 105-109, 92 S. Ct. 349, 354-356, 30 L. Ed. 2d 296 (1971). Under *Chevron Oil*, a court must look to the following factors to determine whether to reject retroactive application of a new decision in favor of purely prospective application:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . . Second . . . [a court must look] to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation . . . . [Third, a court must look to] the inequity imposed by retroactive application . . . .

*Id.* at 106-107, 92 S. Ct. at 355 (internal citations and quotations omitted); *accord McKinney v. Pate*, 20 F.3d 1550, 1565 (11th Cir. 1994) (en banc).

1. *The Continued Validity of Pure Prospectivity and the Chevron Oil analysis*

Elisabeth argues that the Supreme Court has impliedly precluded the possibility of prospective only application and, at the very least, has invalidated

the *Chevron Oil* test as the governing analytical framework for such determinations. We disagree.

Although prospectivity appears to have fallen into disfavor with the Supreme Court, *see Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 94-99, 113 S. Ct. 2510, 2516-18, 125 L. Ed. 2d 74 (1993)*; James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 534-544, 111 S. Ct. 2439, 2442-2448, 115 L. Ed. 2d. 481 (1991)*; Griffith v. Kentucky*, 479 U.S. 314, 320-328, 107 S. Ct 708, 711-716, 93 L. Ed. 2d 649 (1987), the Court has clearly retained the possibility of pure prospectivity and, we believe, has also retained the *Chevron Oil* test, albeit in a modified form, as the governing analysis for such determinations in civil cases. *See Harper*, 509 U.S. at 94-99, 113 S. Ct. at 2516-18.

In contrast, for newly announced rules governing criminal prosecutions, the Supreme Court has completely rejected both pure prospectivity, which occurs where a court gives a newly announced rule no retroactive effect, and modified prospectivity, which occurs where a court applies a newly announced rule retroactively on a case by case basis. *Griffith v. Kentucky*, 479 U.S. 314, 320-28, 107 S. Ct. 708, 711-16, 93 L. Ed. 2d 649 (1987); *see also United States v. Calhoon*, 97 F.3d 518, 529 (11th Cir. 1996) (holding that *United States v. Gaudin*, 515 U.S. 506, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995), which held that

materiality is a jury issue under statute criminalizing falsification or concealment of material fact, applied retroactively to appeal of pre-*Gaudin* convictions). However, while *Griffith* and subsequent criminal cases demonstrate the Supreme Court's apparent disfavor of prospectivity generally, they are otherwise of limited application to the present case. As we recognized in *McKinney*, "[the] realm [of criminal cases] is wholly distinct (as far as retroactivity is concerned) from civil cases." *McKinney*, 20 F.3d at 1566; *see also American Trucking Assocs., Inc. v. Smith*, 466 U.S. 167, 178-79, 110 S. Ct. 2323, 2331, 110 L. Ed. 2d 148 (1990) (discussing inapplicability of *Griffith* in civil context); *Griffith*, 479 U.S. at 322 n.8, 107 S. Ct. at 713 n.8 (noting that "[civil retroactivity] continues to be governed by the standard announced in [*Chevron Oil*]"). Accordingly, *Griffith* and other criminal cases provide little guidance to the retroactivity analysis in the civil context, beyond their support for the broad proposition that prospectivity is a disfavored exception to the general rule.

The dissent relies almost exclusively on criminal cases based on its contention that James, and others similarly-situated, may face retroactive liability for punitive damages. However, no district court in this circuit has assessed punitive damages on James or anyone else, and neither the statutory language of Title III, nor our opinion today, compels any court to do so. The statute merely

11

provides that a successful plaintiff in a civil action *may* recover *inter alia* "punitive damages *in appropriate cases*." 18 U.S.C. § 2520(b)(2) (emphasis added). The question of what constitutes an "appropriate case" for punitive damages under Title III is not presently before us, and we cannot address it without having to speculate about what relief district courts might deem "appropriate" in this case, or in other similar cases. The dissent's analysis is therefore suspect in its reliance on criminal cases, and on the speculative possibility of a district court in the future assessing punitive damages on a past violator of Title III. Accordingly, we choose to rely on Supreme Court pronouncements arising in the civil context in assessing whether retroactivity is appropriate in the civil context.

The Supreme Court has retreated from, but has not abandoned, prospectivity in civil cases. *See Harper*, 509 U.S. at 94-99, 113 S. Ct. at 2516-2518; *Beam*, 501 U.S. at 534-544, 111 S. Ct. at 2442-2448. In *Harper* and *Beam*, the Supreme Court rejected modified prospectivity in civil cases. *Harper*, 509 U.S. at 94-99, 113 S. Ct. at 2516-2518; *Beam*, 501 U.S. at 534-544, 111 S. Ct. at 2442-2448. *Harper* and *Beam* both dealt with the question of whether a rule announced and applied retroactively in a prior case should be applied under pure retroactivity (*i.e.*, retroactive in all cases) or modified prospectivity (*i.e.*, retroactive only in some

12

cases) in subsequent cases. The main principle for which *Harper* and *Beam* stand is that once a court applies a newly announced rule to the parties before it, all other courts must apply that rule to all pending cases. *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752, 115 S. Ct. 1745, 1748, 131 L. Ed. 2d 820 (1995). Therefore, the limitation on prospectivity outlined in *Harper* and *Beam* is also of limited relevance here where we are confronted with the question of whether to apply a newly announced rule prospectively in the first instance.

Although *Harper* and *Beam* ruled out modified prospectivity, they did not alter the underlying validity of pure prospectivity or the *Chevron Oil* test. First, the Court's primary reason for rejecting modified prospectivity was to prevent treating similarly-situated litigants differently by permitting "the substantive law [to] shift and spring according to the particular equities of [individual parties'] claims of actual reliance on an old rule and of harm from a retroactive application of the new rule." *Harper*, 509 U.S. at 97, 113 S. Ct. at 2517 (internal quotations omitted). The initial determination of whether to apply a new rule purely prospectively or retroactively does not implicate such concerns because both approaches treat all similarly-situated litigants the same and neither results in the "erection of selective temporal barriers to the application of federal law in noncriminal cases." *Id.*, 509 U.S. at 97, 113 S. Ct. at 2517. Therefore, we

13

conclude that the reasoning behind the Court's rejection of modified prospectivity in *Harper* and *Beam* does not impact the availability of pure prospectivity in civil cases.

Furthermore, both *Harper* and *Beam* implicitly affirmed the continuing relevance of the *Chevron Oil* test in initially determining whether a newly announced rule applies prospectively or retroactively. Although the Court splintered in *Beam*, producing no clear majority opinion, only Justice Scalia, joined by Justices Marshall and Blackmun, rejected the concept of pure prospectivity altogether. *See Beam*, 501 U.S. at 548-549, 111 S. Ct. at 2450-2451 (Scalia, J., concurring). Justice Souter's opinion, joined by Justice Stevens, implicitly recognized the continuing validity of the *Chevron Oil* test by recognizing the limiting effect that *Beam* had on the test. *Id.*, 501 U.S. at 543, 111 S. Ct. at 2447 ("Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case."). Justice White filed a concurring opinion in which he explicitly reaffirmed the relevance and applicability of the *Chevron Oil* test. *Id.*, 501 U.S. at 544-547, 111 S. Ct. at 2448-2449. Finally, Justice O'Connor filed a dissenting opinion joined by Chief Justice Rehnquist and Justice Kennedy

14

wherein she specifically retained the option of prospectivity and reaffirmed that *Chevron Oil* was the analysis governing such determinations. *Id.*, 501 U.S. at 549-553, 111 S. Ct. at 2451-53. Therefore, a majority of the Justices in *Beam*, albeit in two concurring opinions and in one dissenting opinion, reaffirmed, either implicitly or explicitly, the continuing validity of the *Chevron Oil* test.

In *Harper*, the Court adopted a rule that the majority said "reflect[ed] the position of a majority of [the] Justices in *Beam* . . . ." *Harper*, 509 U.S. at 97, 113 S. Ct. at 2517. In doing so, the majority merely reiterated the rule that once a court retroactively applies a newly announced rule in one case, the rule must be applied retroactively to all pending cases. *Id.,* 509 U.S. at 97, 113 S. Ct. at 2517. In announcing this rule, the majority relied on language from and citations to *Griffith* that would tend to indicate a strong statement against prospectivity given the Court's wholesale abandonment of prospectivity in criminal cases in *Griffith. Id.*, 509 U.S. at 95, 113 S. Ct. at 2516. However, despite the majority's reliance on *Griffith*, the Court in *Harper* did not reject the possibility of pure prospectivity and, in fact, appears to have implicitly reaffirmed the continuing validity of the *Chevron Oil* test by recognizing the manner in which *Harper* and *Beam* altered its application. *Id.*, 509 U.S. at 95 n.9, 113 S. Ct. at 2516 n.9. Most significant is the fact that, although the Court adopted a position and language which moved the

15

Court away from prospectivity, the Court did not take the final step toward a regime of pure retroactivity in all civil cases. Furthermore, the only opinion to take that step, a concurrence written by Justice Scalia, was not joined by any of the other Justices. *See id.*, 509 U.S. at 102-110, 113 S. Ct. at 2520-24 (Scalia, J., concurring).

For the foregoing reasons, we conclude that we must still determine whether a newly announced rule in civil cases should apply retroactively or prospectively in the first instance and that *Chevron Oil* governs such a determination. Therefore, we now turn to the *Chevron Oil* analysis to determine whether the rule overruling *Simpson*, which we announce today, should apply retroactively or prospectively.

2. *Chevron Oil analysis*

As an initial matter, we recognize that both *Harper* and *Beam* preclude the use of subjective reliance by particular litigants or the subjective evaluation of the equities in specific cases to resolve questions of prospectivity. *Harper*, 509 U.S. at 97, 113 S. Ct. at 2517*; Beam*, 501 U.S. at 543, 111 S. Ct. at 2447 ("Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case.").

16

The requirement for objective evaluation of the impact of newly announced rules flows from the policy of treating all similarly-situated litigants in the same manner. This new analytical regime presents a problem for the question before us because both the second and third factors of the *Chevron Oil* test have traditionally been subjective in nature and, therefore, incompatible with the holdings of *Harper* and *Beam*. *See McKinney*, 20 F.3d at 1565 (stating that the second *Chevron Oil* factor requires that "the application of the old rule *in the instant case* must not contravene the purpose and operation of the provision being interpreted" and that the third factor requires that the "application of the new rule *in the instant case* must be inequitable" (emphasis added)). *But see Beam*, 501 U.S. at 543, 111 S. Ct. at 2447 ("[T]he *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case."). Elisabeth suggests that this analytical shift toward objectivity counsels in favor of a wholesale rejection of *Chevron Oil*. We disagree.

In our view, the proper approach is to reconcile the *Chevron Oil* test with the Supreme Court's move toward objectivity. By doing so, we recognize that the second and third prongs of *Chevron Oil* are properly viewed today as objective inquiries that examine the impact of a newly announced rule on the entire class of persons potentially affected by the new rule, rather than the impact on any specific

17

litigant. *See Beam*, 501 U.S. at 543, 111 S. Ct. at 2448 ("The applicability of rules of law is not to be switched on and off according to individual hardship . . . . Of course, the generalized enquiry permits litigants to assert, and the courts to consider, the equitable and reliance interests of parties absent but similarly situated."). Therefore, we now turn to an analysis of the *Chevron Oil* factors.

We first look to whether our decision today "announce[s] a new principle of law, either by overruling clear past precedent or by deciding an issue of first impression the resolution of which was not clearly foreshadowed." *McKinney*, 20 F.3d at 1565. *Simpson* has been the law of this circuit since 1974, and today's ruling unequivocally abandons our previous interpretation of Title III. Therefore, the first prong of *Chevron Oil* is satisfied and weighs in favor of prospectivity because our decision today overrules "clear past precedent." *Id.*

Second, we examine whether "retrospective operation will further or retard [the rule's] operation." *Chevron Oil*, 404 U.S. at 107, 92 S. Ct. at 355. We first note that the purpose of Title III is to "prohibit[] all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials . . . ." 1968 U.S.C.C.A.N. 2112, 2113. Title III partly effectuates this purpose by providing for a civil damages action for victims of illegal wiretapping. 18 U.S.C. § 2520. Applying the new *Glazner* rule retroactively would unquestionably

18

further the purpose and operation of Title III by compensating past victims of illegal interspousal wiretapping and, at the same time, deterring those persons who are either currently wiretapping their spouses or planning to do so in the future. Furthermore, we fail to see how applying the statute retroactively would, in any way, retard its operation or purpose. In fact, we see more danger of retarding Title III's operation and purpose by applying it prospectively-only. Therefore, we conclude that the second prong of the *Chevron Oil* analysis clearly weighs in favor of retroactive application.

We next turn to the third prong of the *Chevron* test: whether making the rule retroactive would be inequitable. *Chevron Oil*, 404 U.S. at 107, 92 S. Ct. at 355. In applying the rule that we announce today retroactively, the primary inequity is the potential for such retroactive application to create liability where none previously existed. If this were truly a situation where the class of persons affected by the new rule would suddenly face a strong likelihood of liability when they faced no possibility of liability before, we would be inclined to view the equities as weighing heavily in favor of pure prospective application. However, such is not the case here.

Every state in this circuit has made wiretapping of the sort James engaged in a crime. ALA. CODE § 13A-11-31 (1994); O.C.G.A. § 16-11-62 (1999); FLA. STAT.

19

ANN. § 934.03(1) (2001). Violation of the Georgia wiretap statute is a felony that carries the penalty of one to five years in prison, up to a $10,000 fine, or both. O.C.G.A. § 16-11-69 (1999). Violation of the Florida statute is also a felony and carries a penalty of up to five years in prison, up to a $5,000 fine, and possible additional penalties for habitual felony offenders. FLA. STAT. ANN. §§ 934.03(4)(a) & 775.082 to .083 (2001). Furthermore, neither Georgia nor Florida appear to recognize a spousal exception to their wiretap statutes. *See Middleton v. Middleton*, 376 S.E.2d 368, 368-69 (Ga. 1989); *Markham v. Markham*, 272 So. 2d 813, 814 (Fla. 1973).

Likewise, Alabama has made the recording of private communications a misdemeanor, ALA. CODE § 13A-11-31 (1994), and the installation of a wiretapping device a felony, ALA. CODE § 13A-11-33 (1994). A person violating these provisions faces up to one year in jail for the misdemeanor, and ten years in prison for the felony. ALA. CODE § 13A-5-6, 7 (1994). No Alabama state court has construed either of these statutes to encompass a spousal privilege, and the statutory language appears to preclude the existence of any such privilege. *See* ALA. CODE § 13A-11-31, -33 (1994). Alabama law also allows an injured party to sue a tortfeasor for the commission of a crime amounting to a felony, even if the government does not prosecute the tortfeasor for the criminal violation. ALA.

20

CODE § 6-5-370 (1994). Furthermore, the Alabama Supreme Court has held that interspousal wiretapping violates Title III. *Ex parte O'Daniel*, 515 So. 2d 1250, 1252-53 (Ala. 1987).

Based on the law of every state in this circuit, any individuals falling within the class of persons affected by the rule we announce today would already necessarily have exposed themselves to significant criminal and potential civil liability under state law for engaging in the wiretap actions that would expose them to additional liability under Title III.[4] Even though retroactive application of the rule we announce today may result in alternative liability in federal court for this class, we conclude that this extension of liability is not sufficiently inequitable to justify prospective-only application given that the class would already be facing felony prosecution, imprisonment, fines, and potential civil liability under state law.

---

[4] *Compare* 18 U.S.C. § 2511 ("[A]ny person who– (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished . . ."), *with* ALA. CODE § 13A-11-31(a) ("[A] person commits the crime of criminal eavesdropping if he intentionally uses any device to eavesdrop, whether or not he is present at the time.") *and* ALA. CODE § 13A-11-33 ("[A] person commits the crime of installing an eavesdropping device if he intentionally installs or places a device in a private place with knowledge it is to be used for eavesdropping and without permission of the owner and any lessee or tenant or guest for hire of the private place.") *and* FLA. STAT. ANN. § 934.03 ("[A]ny person who: (a) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication . . . shall be punished . . . .") *and* O.C.G.A. § 16-11-62 ("It shall be unlawful for: (1) Any person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place.").

On balance, we conclude that the *Chevron Oil* test does not weigh in favor of prospective-only application of the new *Glazner* rule. Although the first part of *Chevron Oil* leans in favor of prospective-only application, the second part weighs in favor of retroactive application and the third part does not weigh sufficiently in favor of prospective-only application to justify abandoning the "presumptively retroactive effect" of our decision today. *Harper*, 509 U.S. at 96, 113 S. Ct. at 2517. Accordingly, we apply the new *Glazner* rule retroactively[5] and hold that the former spousal privilege available under *Simpson* does not bar Elisabeth's suit against James under Title III.

## C. Conclusion

For the foregoing reasons, we overrule *Simpson* and hold that no interspousal wiretapping exception exists in Title III. We also hold that this new rule abolishing the interspousal exception in *Simpson* applies retroactively. Accordingly, we REVERSE the district court's grant of James's motion for summary judgment and REMAND this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

[5] "[R]es judicata and procedural barriers such as statutes of limitations" necessarily circumscribe the retroactive application of the rule we announce today. *Beam*, 501 U.S. at 535, 111 S. Ct. at 2443. And we express no view on whether the rule would apply retroactively insofar as criminal liability is concerned.

CARNES, Circuit Judge, concurring:

I join all of the Court's opinion and write separately to respond to the dissenting position, which is spelled out in Chief Judge Edmondson's and Judge Black's opinions.

Because the foundation of the dissenting position is laid upon reliance and fairness interests, it must stand or fall with the presumption that everyone, including Mr. Glazner, knows the law. That is a great and hoary presumption underlying much of our law. The problem is not with the presumption but with the dissenters' unwillingness to embrace it fully, instead of giving it only a little squeeze. They would have us presume that at the time Mr. Glazner decided to electronically invade his wife's privacy, he knew the law insofar as it includes our Simpson decision but he did not know the more fundamental law that any of our decisions, including Simpson, are subject to being overruled at any time by the Supreme Court or by this Court sitting en banc.

The dissenters would have us presume that the mythical lawyer Mr. Glazner did not actually visit for advice, but could have, would have advised him to wiretap without worry. That advice apparently would have been based on the belief that although Simpson was a badly reasoned decision rejected by virtually every other circuit to consider it, nonetheless Simpson was unshakable law in this

23

circuit that could never be changed; and even if it were changed some day, the new rule could never be applied retroactively to Mr. Glazner's intended misconduct even though the law strongly favors making new rules of decisional law retroactively applicable.

In other words, the dissenters would have us presume that if Mr. Glazner, or other would-be wiretapping spouses, had sought out legal advice they would have received bad advice. The fundamental flaw in their reasoning becomes even more apparent when one considers that to make it work we must also presume the mythical lawyer would not have advised Mr. Glazner that the activity he wanted a green light to pursue is a crime in Alabama. See ALA. CODE §§ 13A-11-31; 13A-11-33 (1994). Or perhaps we should indulge the equally untenable presumption that Mr. Glazner would have been more concerned about civil liability than criminal prosecution.[1]

---

[1]Judge Black's dissenting opinion says that an argument, about which she disavows any view, could be made that Mr. Glazner's misconduct may not have constituted the crime of installing an eavesdropping device, which is a felony in Alabama. See Dissenting op. of Black, J. at 4. That argument, if it were made, would be based upon the owner exception contained in the statute that prohibits installation of an eavesdropping device. Id.; see ALA CODE § 13A-11-33 ("...and without permission of the owner..."). However, there clearly is no "owner" exception in the other Alabama criminal statute Mr. Glazner's misconduct violated. That statute provides: "A person commits the crime of criminal eavesdropping if he intentionally uses any device to eavesdrop, whether or not he is present at the time." ALA. CODE § 13A-11-31. "Eavesdrop" is defined to include recording any part of the private communication of others without the consent of at least one of the persons engaged in the communication. See ALA. CODE § 13A-11-30(1). A violation of that statute is a Class A misdemeanor, which is punishable by a term of imprisonment of up to a year in jail. ALA CODE §§ 13A-11-31; 13A-5-7(a)(1).

24

Whatever one may think of the quality of the Bar in Alabama, if we are going to indulge presumptions about everyone knowing the law and getting legal advice, we should presume accurate knowledge of the law and competent legal advice. If Mr. Glazner is presumed to have known the law – and the dissenting position teeters atop that presumption – he must be presumed to have known that the <u>Simpson</u> decision was not immutable, and that not only could it be changed but also that the change could be applied retroactively. And he must be presumed to have known that the conduct he was engaging in is a crime in Alabama; no change in the law is needed for that. With accurate and complete understanding of the law presumed, as it must be, any reliance interest Mr. Glazner may claim is too unreasonable to figure into the decisional calculus of this case. We should not pause to weep for one who thought that he was simply committing a crime and potentially subjecting himself to civil liability in state court, only to learn later that his conduct had also given rise to civil liability in federal court. To me, that result does not seem "terribly unfair," as the Chief Judge characterizes it in his dissenting opinion.

Footnote 13 of that opinion illustrates the strange nature of the half-way presumption world into which the dissenters would take us. In that footnote we are told that some people may have chosen to live in the Eleventh Circuit because

the <u>Simpson</u> decision allowed them to covertly wiretap their spouses. It actually says (and all the emphasis is in the original): "I am not trying to be facetious; but before today, some spouses might have chosen to live in the Eleventh Circuit *because* they could wiretap their own telephone without being liable under *federal* law." Dissenting op. of Edmondson, C.J., at n.13.

I suppose, then, a conversation between a couple sitting around their breakfast table in, oh say, Colorado (the Tenth Circuit having rejected <u>Simpson</u> years ago) might have gone something like this:

Jim:   Honey, I've been thinking, we ought to move to Alabama.

Liz:    But Sweetheart, I thought you liked living in Colorado.

Jim:   I do, Sugar, but there's a problem.

Liz:   What's troubling you, Sweetie?

Jim:   Well, Punkin', Colorado is in the Tenth Circuit, and its federal appeals court has held that if I wiretap your private conversations without your knowledge and consent, I may have to pay you damages if you find out and sue me in federal court. But if we move to Alabama, which is in the Eleventh Circuit, its <u>Simpson</u> decision will allow me to invade your privacy electronically without having to worry about your having a civil claim against me in federal court.

Liz:   But Honeybun, doesn't Alabama's criminal eavesdropping statute make it a crime to covertly record conversations without the consent of at least one of the parties to the conversation?

Jim: It does, Snookums, but all I'm worried about is the potential civil cause of action in federal court, not having to serve time in the state slammer.

Liz: You'll look so good in jailhouse stripes, my Love. When do we move?

Only in a world where conversations like that take place does concern about reliance on the <u>Simpson</u> decision by James Glazner and other wiretapping spouses make sense.

EDMONDSON, Chief Judge, dissenting, in which BIRCH and WILSON, Circuit Judges, join:

Federal law should give fair warning before it imposes new penalties on a person. So, although I accept that Simpson v. Simpson, 490 F.2d 803 (5th Cir. 1974), should be overturned, I must dissent from the retroactive application of today's decision that does away with the interspousal wiretap exception.

Today we overturn our precedent, clearly established since 1974, which allows for an interspousal exception to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22 ("Wiretap Act"). See Simpson v. Simpson, 490 F.2d 803 (5th Cir. 1974).[1] But the adversarially-presented arguments in this case also present a controversy about whether today's decision will be given a prospective or retroactive application. Thus, we are faced with the question of whether we should retroactively apply the new interpretation of the law to Mr. Glazner and, thereby, subject him in federal court to pay not only compensatory damages, attorney fees and court costs, but also to pay punitive damages for committing an act that was lawful under the pertinent federal law of our Circuit when he acted.[2] I believe that the answer to the question is "No." I

_____

[1]All decisions by the former Fifth Circuit issued before 1 October 1981 are binding as precedent on the Eleventh Circuit. See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc).

[2]18 U.S.C. § 2520 allows the victim of wiretapping to bring a civil suit against the alleged violator. In addition to equitable relief as may be appropriate, the party may receive not only

28

believe that we are not required by the law to subject Mr. Glazner -- and all similarly-situated persons -- to retroactive liability and penalties. To the contrary, the Supreme Court, I believe, has indicated that we should *not* apply the new and expansive interpretation in that way.[3]

As a rule, retroactivity is strongly favored in judicial decisionmaking. I agree with this approach: prospective lawmaking is more like what legislatures generally do. But *never* has the Supreme Court or our Court ruled out altogether prospective decisions as being beyond the lawful power of federal courts. And I

---

statutory or actual damages (whichever is greater), but also attorney fees and court costs, and punitive damages. § 2520(b)(1)-(3).

By the way, 18 U.S.C. § 2511(4)(a) seems to allow the government to bring criminal charges: "Except as provided in paragraph (b) of this subsection or in subsection (5), whoever violates subsection (1) of this section shall be fined under this title or imprisoned not more than five years, or both."

Because the pertinent statute is part of the Omnibus Crime Control and Safe Streets Act of 1968 and seems to make the conduct here in question a crime (under our new construction of the statute), it might be more accurate to analyze the application of any part of the Act as a matter of criminal law, not civil. But I will do as the Court has done (since the case before us is a civil case) and will not approach the case as purely a criminal law matter, although I will look to criminal law cases for guidance, because this case involves quasi-criminal elements.

[3]I focus on the punitive damages provision of the statute, but I do not mean to suggest that the retroactive application of our judicial enlargement of the Wiretap Act would be right if punitive damages were not involved. In either event, today's decision adds a new and burdensome legal consequence to Mr. Glazner's 1999 conduct: a federal cause of action for damages. For me, this situation is the main cause for concern. Then, in addition, the cause of action is one that allows punitive damages per the statute. Whether Mr. Glazner, in fact, will win or lose this lawsuit and whether, if he loses, he will have to pay punitive damages, besides other damages, is speculative. But what is, as a matter of law, definite now is this idea: today's decision allows Mr. Glazner to be lawfully sued for all the remedies allowed by the statute. Mrs. Glazner has expressly prayed for punitive damages in her complaint in this action, which the Court today allows to go on against Mr. Glazner.

think, if prospective decisionmaking is ever justified, this kind of case -- the explicit overruling of a long-established, statutory-construction precedent impacting on private parties, with punitive consequences arising as a result -- is one where it is appropriate.[4]

———

## I.

"Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor." E.E.O.C. v. Waffle House, Inc, 534 U.S. 279, 295, 122 S.Ct. 754, 765  (2002), quoting Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67, 101 S.Ct. 2748, 2759 (1981).[5]

———

[4]In a kind of criminal law counterpart to Chevron Oil v. Huson, 404 U.S. 97, 92 S.Ct. 349 (1971), the Supreme Court has said that new constitutional rules governing criminal *procedure* should be applied retroactively to cases not yet final. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708 (1987). That decision does not, however, affect the retroactive or prospective application of a new substantive change in criminal law. Griffith is not controlling here.

[5]Punitive damages are commonly viewed as quasi-criminal. The Restatement 2d Torts § 908(1) defines "punitive damages" as "damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." Most jurisdictions view punitive damages in that way. See U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600, 616 (11th Cir. 2000) ("We start from the principle that punitive damages are awarded solely to punish defendants and deter future wrongdoing.") (internal quotations omitted); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19, 111 S.Ct. 1032, 1044 (1991) ("It is true, of course, that under Alabama law, as under the law of most States, punitive damages are imposed for the purposes of retribution and deterrence. They have been described as quasi-criminal.") (internal citation omitted); Smith v. Wade, 461 U.S. 30, 54, 103 S.Ct. 1625, 1639 (1983) (stating that the purposes of punitive damages are to punish and to deter, quoting the definition from Restatement (Second) of Torts § 908(1)); McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508 (1st Cir. 1996) (same); Ciraolo v. City of New York, 216 F.3d 236, 246 (2d Cir. 2000)

30

On punitive damages, the Supreme Court has said that "[t]he very labels given 'punitive' or 'exemplary' damages, as well as the rationales that support them, demonstrate that they share key characteristics of criminal sanctions. *Retroactive imposition of punitive damages would raise a serious constitutional question* [under the Due Process Clause]." Landgraf v. USI Film Products, 511 U.S. 244, 281, 114 S.Ct. 1483, 1505 (1994) (statutory case) (declaring that defendants did not have to pay compensatory and punitive damages for acts that occurred before such penalties were established) (emphasis added). The Fifth Amendment's Due Process Clause provides protection and repose, demanding fair notice. See id. at 266, 1497. We have not found, nor has anyone brought to our attention, an instance where the Supreme Court changed the established construction of a federal statute to make penalties apply retroactively to conduct that clearly appeared not to carry that penalty under federal law when the act was committed.

---

(same); Dunn v. HOVIC, 1 F.3d 1371, 1404 (3rd Cir. 1993) (same), modified, 13 F.3d 58 (3rd Cir. 1993); Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 346 (4th Cir. 2001) (same); Matter of P&E Boat Rentals, Inc., 872 F.2d 642, 652 (5th Cir. 1989) (same); In re Sallee, 286 F.3d 878, 903 (6th Cir. 2002) (same); Calhoun v. DeTella, 319 F.3d 936, 942 (7th Cir. 2003) (same); Denesha v. Farmers Ins. Exchange, 161 F.3d 491, 503 (8th Cir. 1998) (same); In re Exxon Valdez, 270 F.3d 1215, 1245 (9th Cir. 2001) (same, declaring criminal-fine precedents particularly informative in civil cases because of the quasi-criminal nature of punitive damages); Searles v. Van Bebber, 251 F.3d 869, 878 (10th Cir. 2001) (same); Jordan v. Medley, 711 F.2d 211, 216 (DC Cir. 1983) (same).

The United States Constitution prohibits both Congress and the States from passing an ex post facto law, that is, from passing a law to make unlawful earlier conduct that was lawful when done. U.S. Const. art. I, § 9, cl. 3; U.S. Const. art. I, § 10, cl. 1. Of course, the clause is binding only on legislatures. See Marks v. United States, 430 U.S. 188, 191, 97 S.Ct. 990, 992 (1977) (criminal case). But the similar Due Process principle of fair notice applies to the judiciary's acts. See id. at 191-92, 992-93 ("[T]he principle on which the [Ex Post Facto] Clause is based [—] the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties [—] is fundamental to our concept of constitutional liberty."). As such, the Due Process Clause of the Fifth Amendment prohibits the judiciary from punishing parties through judicial construction of a statute unless fair notice was given that the conduct was prohibited before the conduct took place. See id.; see also Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697 (1964) (criminal case); Rabe v. Washington, 405 U.S. 313, 92 S.Ct. 993 (1972) (criminal case).[6] "Elementary considerations of fairness dictate that individuals

---

[6]While *not* a strict analogy, it is pretty fair to say that as the Ex Post Facto Clause is to the legislature, the Due Process Clause is to the judiciary. This observation is not to say that the legislature and judiciary are subject to the same rules, but rather that the two branches are guided by the same important principle: protecting the people and their liberties from an abuse of government.

Cf. Rogers v. Tennessee, 532 U.S. 451, 462, 121 S.Ct. 1693, 1700 (2001) (criminal case) (stating that the Ex Post Facto Clause principles cannot strictly be applied to the common law, but concluding that "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect . . . [when] it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'"), citing

32

should have an opportunity to know what the law is and to conform their conduct accordingly." Landgraf, 511 U.S. at 265, 114 S.Ct. at 1497 (1994).

In the present case, the wife admits in her brief that Simpson "provide[s] immunity" for interspousal wiretapping; and she concedes that the overturning of Simpson would create new law for the Circuit. Even if we think Mr. Glazner's wiretap was not right, it seems very wrong for a federal court to subject him to punishment for committing an act that was clearly lawful under the pertinent federal law in the Eleventh Circuit when he committed the act.[7] See generally Landgraf, 511 U.S. at 283 n. 35, 114 S.Ct. at 1506 n. 35 ("Even when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent

---

Bouie v. City of Columbia, 378 U.S. 347, 354, 84 S.Ct. 1697, 1703 (1964). Here, we are not dealing with the judicial alteration of a common law doctrine, but rather of a legislative enactment.

[7]As I understand it, roughly half of the federal circuits have expressed no view about whether an interspousal exception applies to the pertinent statute. Several circuits have opined that no such exception applies. But that some other circuits have concluded that no interspousal wiretap exception exists did not -- could not -- remove the binding force of Simpson as the law of *this* Circuit before today. Circuit splits are not uncommon. And they are not resolved by a majority vote of the circuits. They are resolved by Congress or the Supreme Court. Therefore, that other circuits gave the statute a different meaning than Simpson provided inadequate notice to the residents of this Circuit that the statutory construction would change and, more important, that a new construction would be applied retroactively in this Circuit to completed conduct.

By the way, it is not just the Fifth and Eleventh Circuits that have said that some exception applies to the pertinent statute for wiretaps made by a spouse in his residence. The Second Circuit, in Anonymous v. Anonymous, 558 F.2d 677 (2d Cir. 1977), concluded that no Title III violation arises when a spouse (or ex-spouse) wiretaps his own phone in his own home in purely domestic matters, which are "clearly to be handled by the state courts." Id. at 679. See also Janecka v. Franklin, 843 F.2d 110 (2d Cir. 1988) (upholding dismissal of Title III claim on the authority of Anonymous).

33

whenever the law imposes additional burdens where there clearly were none before.").

Law is not static. It can change. But the Constitution sets some limits on how the law can be changed and on whom the change can impact. Given the long-standing construction in this Circuit of the pertinent federal statute when Mr. Glazner conducted the wiretap, he was not fairly warned that his conduct would violate the federal statute. I worry that applying our new construction of the statute to Mr. Glazner today violates the Constitution. "The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely." Robert Bolt, "A Man for All Seasons" Act II, 89 (Vintage 1960) (speech of Sir Thomas More). As we said before, "[t]o be free of tyranny in a free country, the causeway's edges must be clearly marked." United States v. Brown, 79 F.3d 1550, 1562 (11th Cir. 1996). In this Circuit, the federal law's borders were marked before today in a way that did not penalize a wiretap of the kind underlying this case.

## II.

I question whether Chevron Oil v. Huson, 404 U.S. 97, 92 S.Ct. 349 (1971), controls this case. I have already set out my view that the Constitution directly

bars a retroactive application of today's new interpretation of the pertinent statute. I also suspect that the circumstances here (a case involving a change in substantive law with quasi-criminal aspects) are too different from Chevron Oil,[8] but I will accept that it does apply for discussion's sake. Applying the Chevron Oil analysis to this case, I believe that today's new edict removing the interspousal wiretap exception should not be applied retroactively.

Briefly stated, Chevron Oil considered three elements in deciding whether to apply a rule retroactively: (1) whether a new principle of law has been established; (2) whether retroactive application of that new law would "further or retard" the purpose and effect of the rule in question; and (3) whether substantial inequity would result from its retroactive application. Chevron Oil, 404 U.S. at 106-07, 92 S.Ct. at 355.[9]

---

[8]Chevron Oil involved whether to apply a change in a statute of limitations retroactively. In a recent case, our Circuit, en banc, used the Chevron Oil test to decide whether a new rule allowing district courts to deny plaintiffs leave to amend their complaints *sua sponte* should be applied retroactively. We decided that the answer was "No": the rule should be applied prospectively only. Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541 (11th Cir. 2002)(en banc). Less concern arises from applying laws retroactively in procedural matters because they "regulate secondary rather than primary conduct." Landgraf, 511 U.S. 244, 275, 114 S.Ct. 1483, 1502. Yet, as Wagner shows, even in procedural matters we hesitate before applying changes retroactively; and we sometimes -- I think quite rightly -- decline to do so.

[9]Chevron Oil has since been limited, by disallowing selective prospectivity. Once a new rule has been applied retroactively to one party in a case, it must be applied retroactively to all parties in all similar cases. See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 544 (11th Cir. 2002); see also McKinney v. Pate, 20 F.3d 1550, 1566 (11th Cir. 1994) (en banc).

35

Everyone agrees that the first element -- whether new law has been established -- is clearly met with the overturning of <u>Simpson</u>. In my view, the second element also does not support retroactive application. The retroactive application of the new interpretation -- which removes the interspousal wiretap exception -- does not retard the purpose of the pertinent statute, but neither does it further the purpose more than applying the old <u>Simpson</u> interpretation to the instant case. The statute's core *goal* is not to punish wiretapping, but instead to *prevent* (prohibit by deterrence) wiretapping.[10] Here, the wiretap has already occurred; and neither the law of the <u>Simpson</u> case nor the law of today's case can prohibit or prevent wiretaps that have already happened. <u>See</u> <u>Usery v. Turner Elkhorn Mining Co.</u>, 428 U.S. 1, 17-18, 96 S.Ct. 2882, 2893 (1976) ("hesitat[ing] to approve the retrospective imposition of liability on any theory of deterrence or blameworthiness") (internal citations omitted). Furthermore, applying the <u>Simpson</u> rule to Mr. Glazner -- and those persons materially similar -- will not encourage others to wiretap their spouses in the future. We have made clear today that the interspousal exception no longer exists in our Circuit. We have furthered the deterrent purpose whether we apply today's decision retroactively or not.

---

[10]"To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than [those] duly authorized . . . ." S. Rep. No. 90-1097 (1968), <u>reprinted in</u> 1968 U.S.C.C.A.N. 2112, 2153.

We must weigh the last element: whether substantial inequity would result in applying the new statutory interpretation retroactively. Before today, it was clearly established law that it (even if dishonorable) was *not* illegal under federal law, as long interpreted by our Circuit, for a husband to record his wife's conversations (or vice versa) in the home that they shared.[11] Sitting en banc (as we must when we overrule a past precedent), we have just now changed the law of the Circuit. But in this country, a law must be made accessible to people before punishment may be imposed so that the people have the opportunity to obey the law. To do otherwise is fundamentally unjust.

Given the nature of our federalism, the nonexistence of an interspousal wiretap exception under state law does not make the retroactive removal of the federal exception and the application of federal penalties just or lawful. We are bound to apply the federal law of our Circuit, even if there is a contrary state law in a state where we sit.[12] That wiretapping one's spouse is unlawful under an

---

[11]I assume that Mr. Glazner did not actually rely on the <u>Simpson</u> rule before acting, but the record is not completely clear. While it appears to be clear that he did not seek advice from legal counsel about the use of the tape recorder, it is not clear whether he learned of the <u>Simpson</u> rule in some other way. The larger point, though, is that it is *not* important whether Mr. Glazner actually relied on <u>Simpson</u> before acting. The important fact is that his conduct was *not* contrary to federal law when he committed the conduct. In general, that which is not prohibited is permitted. In addition, here, there was express permission, per <u>Simpson</u>.

[12]"We live in the jurisdiction of two sovereignties, each having its own system of courts to declare and enforce its laws in common territory. . . . They exercise jurisdiction, it is true, within the same territory, but not in the same plane." <u>Ponzi v. Fessenden</u>, 258 U.S. 254, 259, 261, 42 S.Ct. 309,

Alabama statute does not make it unlawful under a federal statute. That a person is subject to be penalized under a state statute by the state sovereign does not mean that he is subject to penalties by the federal sovereign under a federal statute.[13]

Mrs. Glazner – if she wishes -- may possibly pursue a state claim against her husband for the wiretap. The states may punish conduct violating the states' preexisting laws. But she should not be able also to pursue a federal claim against him under the statute involved in the present case. The precise question before us is whether it is inequitable, that is unfair, for the *federal* sovereign to penalize Mr. Glazner. I believe it is terribly unfair for federal courts to penalize completed conduct which the federal courts said was lawful at the time of the conduct. Today's Court definitely adds a new and burdensome legal consequence to Mr. Glazner's 1999 conduct: a federal cause of action for, among other things,

---

310, 311 (1922).

[13]Predictability in the law is important. People are supposed to be able to plan what they will do and to know with some level of confidence whether the planned acts are lawful or not and, even if not, what the consequences will be from different sides. One advantage of having a country made up of many different jurisdictions is that people have a right to move from state to state, or from circuit to circuit, to live in a place that adheres to the version of laws that they prefer. For example, corporations clearly decide where to settle on the basis of law. See generally Guhan Subramanian, The Influence of Antitakeover Statutes on Incorporation Choice: Evidence on the "Race" Debate and Antitakeover Overreaching, 150 U. Pa. L. Rev. 1795 (2002)(finding that corporations often decide not to incorporate in Massachusetts, Ohio, and Pennsylvania because of their severe antitakeover statutes). I am not trying to be facetious; but before today, some spouses might have chosen to live in the Eleventh Circuit *because* they could wiretap their own telephone without being liable under *federal* law. Even if we think it unlikely that someone would live in our Circuit to avoid liability under federal law for wiretapping their spouse, it is our job to ensure that someone cannot be punished retroactively for doing so, as the act was clearly lawful.

punitive damages. And especially to the extent that Mrs. Glazner (and those like her) already has causes of action in state court for the wiretap, it hardly seems unfair to say to her, given the legal history, that she cannot also have the benefit of a new federal cause of action as well.

I need to stress the sweep of the Court's decision today. If we retroactively apply this new rule, it will not just be Mr. Glazner who will be treated unfairly, but also anyone else who has already completed a similar act, including those persons who -- before undertaking to wiretap -- first sought competent legal advice about federal law, then directly relied on <u>Simpson</u>, and took pains to stay within the federal law's proverbial "causeway."[14] Once we decide to apply a rule retroactively, we, as I understand the law, must apply the rule retroactively to all whose cases are still pending. <u>See</u> <u>Wagner v. Daewoo Heavy Indus. Am. Corp.</u>, 314 F.3d 541, 544 (11th Cir. 2002) (en banc).

III.

---

[14]I am reminded of the legal maxim, "No one need be wiser than the laws." S.S. Peloubet, <u>A Collection of Legal Maxims in Law and Equity, with English Translations</u> 177 & No. 1452 ("*Neminem oportet esse sapientiorem legibus*") (Fred B. Rothman & Co. 1985) (1884). It is sufficient that one is on the federal law's causeway; one should not need to foretell how and where the federal law may change tomorrow to avoid federal penalties for something done today.

My decision on retroactivity has an impact on my decision on whether Simpson ought to be overruled at all. If I believed a retroactive application was truly required, I would not overrule Simpson.

I reluctantly go along with overruling Simpson. My colleagues think that the court got it wrong about Congress's intent when Simpson, in 1974, construed the statute to exempt interspousal wiretaps in the marital residence. I think my colleagues' interpretation of the statute today is more likely correct. But we are not writing on a blank slate in this case. And stability and certainty in the law are extremely important. Overruling long-established precedents undercuts stability and certainty. So, I tend to think that leaving precedents undisturbed, unless they are very obviously mistakes, is best (especially long-made precedents construing statutes).

I do not regard Simpson as absurd. And, after all, if the courts in the Fifth and Eleventh Circuits have very badly misread the statute, Congress and the Supreme Court have had nearly thirty years to correct this error -- an "error" that before today governed more than one out of every five people in the United States[15]; but neither the Supreme Court nor Congress has acted to correct what we now see as the Simpson fallacy. Still, I do not dissent from today's new

---

[15]According to the 2000 Census, 20.2% of the U.S. population resides in the Eleventh and Fifth Circuits.

construction of the statute. But the past thirty years are not easily erased. In my view, we should not act as if <u>Simpson</u> never was the law to the people in this Circuit.

I would apply today's interpretation of the Wiretap Act to cases based on occurrences of wiretapping in the future, not the past.

On this basis, I would affirm the district court's judgment.

BLACK, Circuit Judge, dissenting:

I agree with Chief Judge Edmondson that, although *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974),[1] should be overturned, the Court's new rule clearly overruling prior circuit precedent should not be applied retroactively. I write separately, however, to state that, in my view, the retroactivity analysis turns on the punitive damages to which the Court's decision subjects Mr. Glazner,[2] and to illustrate how Mr. Glazner's sudden retroactive exposure to punitive damages violates fundamental ex post facto principles incorporated into the Due Process Clause.

Courts repeatedly have recognized punitive damages are quasi-criminal in nature. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 281, 114 S. Ct. 1483, 1505 (1994) ("The very labels given 'punitive' or 'exemplary' damages, as well as the rationales that support them, demonstrate that they share key characteristics of criminal sanctions."); *In re Exxon Valdez*, 270 F.3d 1215, 1245 (9th Cir. 2001) (stating that "punitive damages are quasi-criminal"); *cf. Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19, 111 S. Ct. 1032, 1044 (1991) ("[Punitive damages] have

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[2] In footnote 3 of his dissent, Chief Judge Edmondson states that his reasoning does not depend on the availability of punitive damages. If punitive damages were not available, I think the Court's *Chevron* analysis would carry the day.

been described as quasi-criminal." (citation omitted)). Retroactively applying the Court's new rule would subject Mr. Glazner to quasi-criminal liability. Consequently, I think the Supreme Court's Due Process Clause jurisprudence in the criminal context counsels against retroactivity.

In the criminal context, the Supreme Court has stated the Ex Post Facto Clause "does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191, 97 S. Ct. 990, 992 (1977) (citation omitted). Nevertheless, "the principle on which the Clause is based[,] the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties[,] is fundamental to our concept of constitutional liberty." *Id.* at 191, 97 S. Ct. at 992-93 (citations omitted). Ex Post Facto principles are "protected against judicial action by the Due Process Clause of the Fifth Amendment." *Id.* at 192, 97 S. Ct. at 993. A judicial alteration violates fair warning principles and should not be applied retroactively when it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers v. Tennessee*, 532 U.S. 451, 462, 121 S. Ct. 1693, 1700 (2001) (citation and quotations omitted). In light of our strict adherence to *stare decisis* and the prior panel precedent rule, there was no fair warning that we would

overrule *Simpson* and retroactively apply a new rule to make Mr. Glazner's conduct unlawful.

In *Simpson*, the Court held that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22, has an interspousal exception for wiretapping in the marital home. 490 F.2d at 810. That ruling remained in effect, unaltered, until today. To be sure, other circuits questioned and disagreed with *Simpson*. Such disagreement did not, however, give Mr. Glazner fair warning that we would overturn our decision and retroactively apply a new rule to make his otherwise lawful conduct unlawful.[3]

Moreover, state law did not provide any fair warning. The law of another sovereign simply could not give fair warning to Mr. Glazner that he could be hailed into federal court for punitive damages under a federal statute that, until today, we interpreted not to apply to his conduct. *Cf. Bouie v. City of Columbia*, 378 U.S. 347, 359-60, 84 S. Ct. 1697, 1705-06 (1964) ("It would be a rare situation in which the meaning of a statute of another State sufficed to afford a person 'fair warning' that his own State's statute meant something quite different from what its words said."). To hold otherwise would open floodgates to numerous interpretive questions. Could fair warning be deemed given only by

---

[3] The circuit courts of appeals frequently disagree in interpreting statutes. That certainly does not mean a litigant should not rely on the law of the circuit in which he is litigating.

state statutes, or could it also be deemed given by state common law, regulatory law, and county and municipal ordinances? Must a court considering the fair warning issue interpret state statutes and common law? Would such courts have to certify questions of state law to state supreme courts?

The state statutes potentially implicated by Mr. Glazner's conduct illustrate the problems inherent in such an approach. For example, Ala. Code § 13A-11-33 provides:

> A person commits the crime of installing an eavesdropping device if he intentionally installs or places a device in a private place with knowledge it is to be used for eavesdropping and *without permission of the owner* and any lessee or tenant or guest for hire of the private place.

Ala. Code § 13A-11-33(a) (emphasis added). I express no view as to the merits, but an argument certainly could be made that Mr. Glazner had "permission of the owner" and therefore did not violate § 13A-11-33 since he presumably was an owner of the marital residence. Moreover, in its opinion, the Court cites Ala. Code § 6-5-370 to suggest that Mr. Glazner's conduct exposed him to civil liability. That provision, however, "does not create a cause of action; rather, it merely allows a plaintiff to *commence* a civil action even if the plaintiff does not pursue criminal prosecution of the defendant." *Lewis v. Fraunfelder*, 796 So. 2d 1067, 1070 (Ala. 2000). There may be a remedy under Alabama common law.

45

*See Ages Group, L.P. v. Raytheon Aircraft Co., Inc.*, 22 F. Supp. 2d 1310, 1320 (M.D. Ala. 1998). Still, it is exactly this type of analysis that highlights the unworkability of an approach to the fair warning analysis that looks to the laws of another sovereign.

In conclusion, Mr. Glazner simply had no fair warning that his conduct would subject him in federal court to the quasi-criminal sanction of punitive damages. Consequently, the Court's opinion denies due process to Mr. Glazner. On this basis, I respectfully dissent.